```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                       DISTRICT OF VERMONT
```

UNITED STATES OF AMERICA   :
                           :
                           :     Case no. 2:11-cr-70-3
        v.                 :
                           :
BRETT CARTER,              :
                           :
            Defendant.     :

## Memorandum Opinion and Order:
## Defendant's Motion to Suppress Statements

On June 29, 2011, the Grand Jury returned an indictment charging Defendant Brett Carter with conspiracy to distribute narcotics under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846. Indictment, ECF No. 6.  On November 11, 2011, Carter filed a Motion to Dismiss, Motion to Suppress Statements, and Motion to Sever, ECF No. 68.  The Court held a hearing on January 19, 2012, and denied the motion to dismiss and motion to sever. Mots. Hr'g Tr.("Tr."), ECF No. 95.  On the same day, the Court held an evidentiary hearing on the motion to suppress, took the matter under advisement, and the parties later filed supplemental briefing.  Def.'s Supplemental Mem. in Supp. of Mot. to Suppress Statements, ECF No. 96; Gov't's Reply to Post-Hr'g Mem., ECF No. 98.

Carter's motion to suppress asserts that because he was promised leniency for his assistance, statements Carter made to

law enforcement while assisting in an investigation by the Vermont Drug Task Force ("VDTF") were involuntary and obtained in violation of the Due Process Clause of the Fifth Amendment.

For the reasons described below, the Court denies Carter's motion to suppress.

## I. Statement of the Facts

*A. Check Forgery Allegations and Cooperation with VDTF*

On December 28, 2010 and January 3, 2011, Vermont State Police Detective Sergeant Albert Abdelnour interviewed Carter at the Rutland State Police Barracks regarding allegations of check forgery.[1] During the first interview, Carter denied the allegations, but during the January 3, 2011 interview, Carter confessed to the charges and admitted to being addicted to prescription pills.[2] Tr. 23-25. Det. Srg. Abdelnour issued Carter a citation for the forgery charges and processed him at the police station. During this meeting, Abdelnour informed Carter that he could "help himself out" by working with the government. Tr. 27. Carter was interested in the offer, and the two briefly discussed how Carter may be able to cooperate. Abdelnour made no promises regarding how Carter's pending

---

[1] Carter was not in custody during either of the meetings with Det. Srg. Abdelnour, or during his meeting with Det. Johnson. Tr. 23-25, 40.

[2] Carter called Det. Srg. Abdelnour and initiated the second meeting. Tr. 25.

charges would be handled, and referred Carter to the VDTF to discuss potential cooperation. Tr. 26-29.

Later that day, Carter received a call from Detective Jason Johnson of the VDTF, who offered to meet with him to discuss cooperation. Tr. 40. Det. Johnson picked up Carter near his residence in Rutland in an unmarked police vehicle, and the two drove to the Rutland Medical Center parking lot where Det. Johnson parked the car and began a discussion with Carter. Tr. 40-41. Det. Johnson made no promises or statements to Carter regarding how the pending criminal charges against him would be handled. Det. Johnson did indicate that if Carter successfully cooperated he would receive some sort of benefit regarding the check fraud charges in return for assisting law enforcement, but did not specify what that would be. Tr. 60. He explained that the VDTF was interested in obtaining information about an individual named Jason Boyd[3], and that if law enforcement was interested in the information provided by Carter, that Det. Johnson would contact the State's Attorney in charge of Carter's forgery case, who would contact the Vermont Attorney General's office to work out the details of any cooperation agreement. Tr. 42-43. He explained to Carter that the purpose of the

---

[3] Johnson was familiar with Boyd, as he had "obtained information both from sources on the street as well as law enforcement on the federal and state level pertaining to Jason Boyd's alleged activities over . . . several years." Tr. 39-40.

investigation was not to gather information against him, but rather to investigate of Boyd. Tr. 63-64. At the motions hearing, Det. Johnson testified that Carter was concerned he would be taken into custody that day, but that Det. Johnson had no reason to take him into custody at that time. Tr. 61.

While sitting in the parked car with Det. Johnson, Carter signed a confidential informant packet[4], which explained that no threats or promises were being made and that as an informant he may be outfitted with an audio transmitting device. Tr. 45. This packet included the Confidential Source Code ("Code"), a document containing 22 paragraphs to be initialed by the informant. Pertinent to the case before the Court, the Code stated that the informant agrees "to cooperate with the Vermont State Police and/or the Vermont Drug Task Force of [his] own free will and not as a result of any intimidation or threats." Code ¶ 15, Gov'ts Reply to Post-Hr'g Mem. Ex.A, ECF No. 98-1. The Code also stated that:

> 4. I agree to keep in constant contact with the Vermont State Police and/or the Vermont Drug Task Force while I am assisting them.
> . . . .
>
> 11. I understand that I may not engage in an illegal or improper conduct so long as I am working with the Vermont State Police and/or the Vermont Drug Task Force.
> . . . .

---

[4] This document differed from a formal cooperation agreement in that it did not promise anything in return for the cooperating informant's assistance. Tr. 47-49.

> 14. I understand that any violation of this agreement will result in an investigation of the matter. If charges are substantiated, appropriate action to include the possibility of criminal prosecution will be taken.
> . . . .
>
> 22. I understand that no promises have been made to me regarding consideration for my cooperation. I understand that the investigating officers will make the details and the extent of my cooperation known to the prosecuting attorney who will consider this information when recommending a sentence to the court.

Code ¶¶ 4, 11, 14, 22.

The Confidential Source Code provided by the government includes Carter's initials on every paragraph of the agreement, and is signed by both Carter and Det. Johnson. Code; Tr. 49.

After discussing and signing the Code, Carter informed Det. Johnson that he was an associate of Jason Boyd, and that Boyd was the "kingpin" of a group of individuals distributing Percocet in the greater Rutland area. Tr. 41-42. Carter stated that he had bought Percocet from Chris Black, another associate of Boyd's. In addition, Carter informed Det. Johnson that he was currently living with Ian Turner, who also worked for Boyd. Tr. 42.

After the January 3, 2011 discussion in the Rutland Medical Center parking lot, Carter assisted the VDTF by conducting controlled narcotics purchases. Tr. 50. During the course of the investigation, law enforcement learned through Carter and other sources that Boyd obtained the pills from a source in the

Boston area, and that individuals would travel to Massachusetts with large amounts of cash to purchase the pills for Boyd who would then sell them in and around Rutland. Tr. 50-51.

*B. Arrest and Charges*

On February 9, 2011, Carter was arrested along with Black following a motor vehicle stop on a return trip from Framingham, Massachusetts to pick up pills for Boyd. Carter was found in possession of four Percocet 30 milligram pills, with close to 400 additional pills found within the vehicle. Tr. 50. Carter was not traveling with Black under direction of the VDTF, was not wearing a wire, and the drug task force was unaware that Carter had traveled to Framingham. Tr. 51. On June 26, 2011, Carter was charged along with Boyd, Black, Turner, and an additional associate of Boyd's, Christina White, with conspiracy to distribute oxycodone.

## II. Discussion

A confession is admissible under the constitution only if it is made voluntarily. Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); United States v. Orlandez-Gamboa, 320 F.3d 328, 332 (2d Cir. 2003). The "test for voluntariness is well established and multi-faceted." Orlandez-Gamboa, 320 F.3d at 332. Determining whether a confession was obtained by coercion occurs through evaluation of "the totality of the all the surrounding circumstances." Schneckloth, 412 U.S. at 226. These

circumstances include the Defendant's background and experience, the conditions of interrogation and the conduct of the law enforcement officers. *See* Schneckcloth, 412 U.S. at 226; United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991). In evaluating the totality of the circumstances, "the presence of a direct or implied promise of help or leniency alone had not barred the admission of a confession" when the circumstances show the confession was given freely. Green v. Scully, 850 F.2d 894, 901 (2d Cir. 1988).

Statements by law enforcement that it would benefit a suspect to cooperate are not coercive, but are instead "common sense factual observations." United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995). Specifically, "a confession made pursuant to a cooperation agreement is not the product of coercion." United States v. Guarno, 819 F.2d 28, 31 (2d Cir. 1987). While the court must weigh the totality of the circumstances in analyzing voluntariness, a statement by law enforcement that any cooperation the defendant participates in will be brought to the attention of the prosecuting attorney does not independently suggest coercion. United States v. James, No. 94 CR. 750, 1995 WL 330651, at *4 (S.D.N.Y. June 2, 1995). Additionally, the First Circuit has found that "a promise to bring any cooperation on the part of the defendant to the prosecuting attorney's attention does not constitute a

coercive promise sufficient to render any subsequent statements involuntary and inadmissible." United States v. Baldacchino, 762 F.2d 170, 179 (1st Cir. 1995). *See also* United States v. Curtis, 562 F.2d 1153, 1154 (9th Cir. 1977) (Defendant's confession was voluntary when he was told that any cooperation he participated in would be relayed to the responsible authorities); United States v. Springer, 460 F.2d 1344, 1347 (7th Cir. 1972) (Assurance that United States Attorney would be informed of defendant's cooperation was not a promise of leniency).

In the case before the Court, Carter sought to assist law enforcement in order to obtain some form of leniency for the check forgery charges he was facing. He was first confronted with the idea of cooperating by Det. Srg. Abdelnour and subsequently met with Det. Johnson willingly. Det. Johnson explained to Carter that if his cooperation proved helpful he would contact the Attorney General's office about a formal cooperation agreement. Tr. 42-43. None of the detectives made guarantees as to what Carter would receive in return, apart from suggesting that his cooperation would lead to some form of assistance with Carter's pending check fraud charges. Tr. 60. Contrary to what Carter asserts in his post-hearing briefing, the assertions by Det. Johnson that Carter was not the focus of the VDTF investigation did not constitute an offer of immunity.

Supplemental Mem. in Supp. of Mot. to Suppress Statements, 5. The Confidential Source Code supports this, as the Code made clear that if Carter violated its terms, he could be prosecuted. Code at ¶ 14.

By signing the Code, Carter agreed to keep in contact with the VDTF, he agreed he would not engage in illegal conduct while he was working with VDTF, that he was cooperating on his own free will, and that he understood no promises had been made regarding consideration for his cooperation. Code, ¶¶ 4, 11, 15, 22. When Carter was arrested on February 9, 2011, he violated the Confidential Source Code in that he was not in contact with the VDTF and he was engaging in illegal conduct. The record shows no evidence that Carter was coerced by law enforcement under false pretenses; he was well aware of the limitations of his cooperation and the rules set forth by the Code.

Analyzing the circumstances as a whole, it is apparent that Carter provided information and statements to Det. Johnson and others of the VDTF voluntarily and on his own free will and with an awareness of the consequences of his actions. Thus, the Court finds that the statements made by Carter to Det. Johnson and others during the course of his cooperation were obtained voluntarily and were not in violation of the Due Process Clause of the Fifth Amendment.

For the above reasons, Defendant's motion to suppress is **DENIED**.

Dated at Burlington, in the District of Vermont, this 27th day of February, 2012.

/s/William K. Sessions III
William K. Sessions III
U.S. District Court Judge